**TRINITY FINANCE CORPORATION v. PRICE.**

No. 2662.

Court of Civil Appeals of Texas. Tenth District. Waco.

Jan. 31, 1946.

Rehearing Denied Feb. 21, 1946.

Jay Sam Levey, of San Antonio, for appellant.

P. C. Sanders, of San Antonio, for appellee.

LESTER, Chief Justice.

Trinity Finance Corporation sued Jack Price for the title and possession of a Chevrolet automobile of which it claimed to be the owner and which was of the alleged value of $950, and caused a writ of sequestration to issue against the same. Price answered by a general denial, and specially pleaded that he was the owner of the automobile and entitled to a certificate of title thereto for the reasons, to-wit:

that on October 16, 1944, he entered into a contract with one George Sims to purchase a secondhand 1940 four-door Pontiac sedan; that he agreed to and did pay to said Sims the sum of $780 for said Pontiac car; that Sims was to deliver said car to appellee in two or three days after payment of said $780; that within said period Sims informed him that he was unable to make delivery of the Pontiac car but that he had a 1941 Town Sedan Chevrolet that he would deliver to him instead of the Pontiac; that they agreed to the substitution of said automobiles and Sims thereupon delivered to him the Chevrolet. Price pleaded in the alternative, alleging that the Finance Corporation, in permitting Sims to have possession of the Chevrolet automobile and to offer it for sale to the public or to appellee, constituted Sims an agent of the Finance Corporation.

The Finance Corporation strongly urges that the evidence is insufficient to establish that Sims was its agent with authority to bind it under the facts of this case.

Price testified, as alleged by him, that he was a used-car dealer and in the storage garage business, and that he, on October 16, 1944, contracted with one George Sims, whom he had known for several years, to purchase a Pontiac automobile for the sum of $780. Sims was to deliver the car sometime later. That on October 16th he delivered to Sims a check for $780, payable to the said Sims, which Sims cashed on the same day the check was delivered. Four or five days later Sims informed Price that he was unable to deliver the Pontiac as agreed but that he had a 1941 two-door Chevrolet he would deliver to him instead and upon the same conditions. Price agreed to the substitution of said cars and took the Chevrolet without paying anything therefor save and except the $780 he had paid to Sims on the trade for the Pontiac. Price also testified that Sims did not deliver to him a certificate of title on the Chevrolet and that his excuse for not doing so was "that the car belonged to some minor and he had to send the papers to Ohio for his father's signature, and that as soon as they came back he would deliver them." Sims never did deliver said papers nor did he return to Price his $780, or any part thereof. When Price accepted the Chevrolet instead of the Pontiac, which was four or five days after he had given his check for the sum of $780, he prepared the following which Sims executed:

"This is to certify that on October 16, 1944, I received from Jack Price a check for $780.00 as full payment for a 1940 Pontiac. But due to reasons beyond my control, am unable to deliver the Pontiac as promised, so I am delivering him the McMurray Chevrolet, License No. V89510 instead. It is understood the Chevrolet is fully paid for and that I have full authority to do this and that as soon as I get title and papers back from Ohio that I will send or bring them to him at 212 College Street.

"(Signed) George Sims."

Price's own testimony is that all of his dealings concerning the Pontiac and Chevrolet automobiles up to the time Sims died, which was on January 18 or 19, 1945, were with Sims; that he had no dealings with the Finance Corporation and probably did not know them at that time; that the first time he had any dealings or conversation with any member of the Trinity Finance Corporation was the day George Sims died, when Mr. Sellards, Assistant Manager, came to his place of business and demanded possession of the Chevrolet automobile; that Sellards told him the Trinity Finance Corporation had turned the car over to Sims to sell but he never did sell it and that they never did get any money for it.

J. H. Howard testified for Price and said that he was present when Sellards came and claimed the car and told Price that the car had been stolen and the reason the Finance Corporation had not looked for the car was that it had been turned over to Sims to sell and they thought he had carried it to Georgia or Louisiana.

Sam Radinsky, manager of the Finance Corporation, testified that it owned the Chevrolet prior to this transaction; that a short time prior to the time Sims delivered the car to Price, Sims came to the Finance Corporation and told them that he had a customer that he wanted to sell the car to for so much down payment; that the sale was made to a sergeant and in about a month Sims reported that the sergeant was being transferred out of the United States and couldn't take the car with him and he wanted to sell his equity in it. The Finance Corporation took the car back and the sergeant at that time transferred to the Finance Corporation his certificate of title by signing it on the back. Sometime after taking the car back Sims came in and said that he had a customer he wanted to show the car to and would bring the customer in and close the deal. The Finance Corpora-

tion delivered the car to Sims and they did not see it again until they found it in Price's garage the day Sims died. That it did not authorize Sims to sell the car and made numerous demands upon him for the return of same, which he promised he would do, and upon Sims' failure to return the car after frequent demand and promises on his part that he would do so, they reported to the police that the car had been stolen. That Sims, prior to the time of his death, worked for the Mission City Pontiac Company in San Antonio, Texas.

Viewing all the evidence most strongly in favor of Price, we believe it is insufficient to support the judgment of the trial court. Price did not have any dealings with or know the Finance Corporation in his entire transactions with Sims, but he dealt with Sims independently and as an individual. He first contracted on October 16, 1944, to buy, not from the Trinity Finance Corporation but from Sims, a Pontiac car, and he gave Sims his check for the sum of $780 at that time, which Sims cashed on the same day. Under his contract with Sims he was not to get possession of the Pontiac until two or three days later. Four or five days later Sims reported to Price that he was unable to deliver the Pontiac but that he had a Chevrolet he would let him have instead. Price took the Chevrolet but did not receive from Sims, or anyone else, a certificate of title, but was content to take the car with the representation on the part of Sims that some minor owned the Chevrolet car and he would have to send the papers to Ohio for the signature of the father and a promise that he would give them to him when he got them back. Price being a used-car dealer, and familiar, as he testified, with the law in reference to the transferring of automobiles, it seems to us that those facts alone were sufficient to put him upon notice that Sims did not own the car and in all probability had no authority to sell it under the facts as related by him. There is no evidence that the Finance Corporation owned a Pontiac car on October 16, 1944, or any other time, and there is no evidence that the Chevrolet car had been turned over to Sims at the time he made the contract with Price to sell him a Pontiac car, and if Sims had collected $780 for a Pontiac car, he would certainly have no authority, under the facts in this case, to take a Chevrolet car belonging to the Trinity Finance Corporation and settle his obligation with Price.

The mere possession of property of another does not give the possessor the right to deal with such property as he sees fit. The burden of proof was upon Price not only to establish agency but to establish his authority to bind appellant. This he has wholly failed to do. The above principle has been upheld many times. Barrington v. McBroom, Tex.Civ.App., 157 S.W.2d 463; Gregory v. Newsom, Tex.Civ.App., 279 S.W. 912, point 1, p. 914 (writ ref.), and authorities therein cited.

The judgment of the trial court is therefore reversed and the cause remanded.